## NATIONAL SHOE AND LEATHER BANK OF THE CITY OF NEW YORK

*v.*

## SIMON AUGUST, JACOB S. AUGUST, ABRAHAM S. AUGUST and HENRIETTA AUGUST.

The mortgagor and owner in possession of chattels subject to a mortgage, which is void as to creditors for want of registry and possession taken under it, but is good as between the parties, may sell and dispose of the goods with the consent of the mortgagee, and pay the proceeds to the mortgagee on account of the mortgage debt, and the mortgagee may retain such proceeds of sale as against a judgment creditor of the mortgagor who has failed to make a levy.

Final hearing on pleadings and proofs.

The suit was commenced by a creditors' bill framed under the eighty-eighth and subsequent sections of the Chancery act (*Rev. p. 120*). An order for discovery was made therein and the defendants were examined, and subsequently a new bill was filed, based, in part, upon the result of the said discovery.

The complainant is a judgment creditor of the defendants Simon, Jacob and Abraham August. The debt is that of Jacob and Abraham, who were doing business when it was contracted under the name of "August Brothers." Simon August, the other defendant, appears to occupy the position of endorser. The object of the bill is to obtain a decree against Henrietta August, who is the wife of Simon and mother of Jacob and Abraham, for the payment by her, on account of complainant's judgment, of certain moneys received by her from her two sons, proceeds of the sale of personal property belonging to them as composing the firm of August Brothers. Complainant recovered judgment in New York, on the 5th day of December, 1893, and suit having been brought on that judgment in the Essex county circuit court, judgment was there recovered on tho 9th of December, 1894, and execution thereon returned unsatisfied.

The firm of August Brothers failed in August, 1893, and on the 24th day of that month they executed to their mother, the defendant Henrietta, a paper in these words:

"Whereas we, August Brothers, composed of Jacob S. August and Abe S. August, are indebted to Henrietta August in the sum of twenty-seven thousand two hundred and fifty-eight dollars and seventy-six cents ($27,258.76).

"Now we, the said August Brothers, do hereby grant, bargain, sell and transfer unto the said Henrietta August all the goods, wares, merchandise, stock in trade, and three cutting machines belonging to us, and now stored in the subcellar of the premises No. 8 West 3d street in the city of New York, together with all policies of insurance thereon.

"To have and to hold to the said Henrietta August, as security for the payment of the said indebtedness to her, with authority to her to hold and sell the same at public or private sale, with or without notice to us, and after the payment of the expenses of such sale and the said indebtedness, with interest in full, to render the overplus, if any, to us or our assigns.

"Witness our hands and seals this 24th day of August, 1893.

"AUGUST BROTHERS. [L. S.]
"JACOB S. AUGUST. [L. S.]
"ABE S. AUGUST. [L. S.]

"Acknowledgment dated August 24th, 1893."

This document was never filed or recorded in any public office as a chattel mortgage or otherwise. At the time it was made the goods covered by it were on storage in the subcellar of a warehouse in New York city, in the possession of a firm (Bernheim, Bauer & Company) who were friends of August Brothers, and who permitted them to use their subcellar for the purpose of storing and selling these goods. No manual or other possession of them was ever taken by Mrs. August, unless the possession of her sons can be deemed her possession. They sold of the goods more than sufficient to pay complainant's judgment, and either paid the proceeds directly to their mother or placed them to her credit in bank, or with business houses in New York city.

The disputed question of fact in the case is whether August Brothers were, at the time, indebted to their mother in the sum mentioned in said instrument, or in any other sum. And the disputed questions of law are (1) whether, if the firm was so indebted, the instrument executed by them to their mother was, in substance, a chattel mortgage; and if it be a chattel mortgage, then (2) whether its existence under the circumstances renders Mrs. August liable to account for the moneys received by her from her sons as the proceeds of the sale of said goods. It was agreed that the state of the law in New York might be arrived at by a consideration of the adjudged cases as reported, and from the statutes, a copy of which relating to chattel mortgages was offered in evidence.

*Mr. Bishop* (of New York) and *Mr. Joseph F. Randolph,* for the complainant.

*Mr. Frederic W. Stevens,* for the defendants.

PITNEY, V. C.

*First.* A reading of the instrument in question leads me to the conclusion that it is, in its essential features, a mortgage, and not, as was contended by counsel for defendants, a mere conveyance absolute with power of sale for the purpose of paying, *pro*

*tanto*, a debt. The use of the words, " to have and to hold to the said Henrietta August as security for the payment of the said indebtedness to her," and the provision for rendering the surplus to the grantors, seem to me to render it a mortgage rather than an absolute conveyance. A right of redemption upon payment of the indebtedness is clearly implied, it seems to me, from the use of the language quoted.

*Second.* The statute of New York relating to chattel mortgages is substantially the same as ours, and instruments of that nature are absolutely void as against creditors unless recorded, or unless immediate and actual possession is taken under them. Here I find, as a matter of fact, that no sufficient possession was taken. There was proof offered of authority for the sons, or one of their clerks or salesmen, to take possession in the name of their mother; but it was so clearly colorable and contrary to the spirit of the act, that I conclude, as above stated, that there was no possession taken.

The result is that the instrument is absolutely void as against the complainant, who, it was admitted, was a creditor at the time the instrument was executed, for the very debt on which its judgment is founded.

*Third.* These propositions having been resolved in favor of the complainant, its counsel take the position that, having executed such a paper, and having purported to act under it, the moneys which were the proceeds of the sales of the goods covered by it may be followed by a judgment creditor into the hands of the mortgagee of the void mortgage. This position is taken in the face of the admitted proposition that it was entirely lawful for August Brothers to prefer their mother as a creditor by selling the goods in the ordinary way and paying her the proceeds.

The difficulty with the complainant's position is apparent at once. It claims, in one breath, that the mortgage is absolutely void, and that, at the same time, it may derive a benefit from its, so to speak, negative existence.

There is a line of cases decided in New York, cited and relied upon by counsel, which hold that where the mortgagee of a

Nat. Shoe and Leather Bank *v.* August.

chattel mortgage which is void by reason of not having been recorded and immediate possession not having been taken under it, subsequently and without the concurrence of the mortgagor, takes possession under it, *and by virtue of it* sells the goods and receives the money, a judgment creditor, who recovers judgment subsequent to the sale of the goods founded upon a debt existing at the time, may recover from the mortgagee the moneys so by him received. Such was, in effect, the cases of *Mandeville* v. *Avery, 124 N. Y. 376,* and *Stephens* v. *Perrine, 143 N. Y. 476.*

In the first case the defendant (Avery) was the holder of two chattel mortgages executed by one Beck—one to Avery directly and the other to a bank of which he was president, and by the bank assigned to him. The mortgage to the bank was the older of the two and was not recorded, and no possession was taken under it until the later mortgage was executed, when immediate possession was taken under both by Avery, who sold the goods. And it was held, reversing the supreme court, that the receiver appointed under a judgment recovered by one Ross, a creditor of Beck, could recover against Avery so much of the proceeds of the sale of the goods as was appropriated by him to the payment of the mortgage of the bank. At the bottom of page 385, the learned judge, speaking for the court of appeals, says : " The general term based its decision [in favor of the bank] upon the ground that the debt to the bank having been a valid one, and having been paid out of the mortgaged property before any lien was obtained thereon, another creditor could not compel the mortgagee to refund the money, on the ground that, as against creditors generally, the mortgage given to secure the paid debt would have been adjudged void. Two classes of cases are cited by the supreme court to sustain this conclusion. [Omitting the first class.] '*Second.* That the objection that a chattel mortgage is void is not available, when, before any creditor had questioned its validity, the mortgagor delivered the chattels to the mortgagee and authorized an immediate sale thereof by him. * * *
As to the second [class], there is no doubt as to the right of a debtor to prefer any creditor and to pay his debt in full, either in money or property, to the exclusion of all others. But to

apply that principle to this case is to ignore completely the facts pleaded and found by the court. *There was no claim that the property sold was turned over by Beck* [the debtor] *to Avery in payment of the debt. The complaint alleged that the property was sold by Avery under the mortgage, and this fact was not denied by the answer.'* The court also found that Avery, by virtue of both mortgages, took possession of the mortgaged property, and as such mortgagee caused the same to be advertised at public sale and sold under said mortgages. *There is nowhere any suggestion in the evidence or findings that the mortgage was waived or abandoned, or that the debtor had voluntarily delivered the property to Avery with authority to sell it. Everything that was done was pursuant to and under the mortgages. Avery could not and did not claim to have received the property or the proceeds of the sale in payment of his debt as the voluntary act of the debtor, but as mortgagee.* He cannot, therefore, assert against the claim of other creditors the honesty of his own debt. The mortgage being void, all proceedings under it were void, and although he may possess an honest claim, he cannot retain property obtained by him under a fraudulent mortgage against a pursuing creditor. The proceedings taken to collect the debt are unlawful."

It will thus be seen that the decision was put upon the distinct ground that the claim of Avery rested upon the mortgage, and not upon a voluntary payment by the debtor.

In the next case—*Stephens* v. *Perrine*—the failing debtors, Aldrich & Company, had given a chattel mortgage to the defendant in the action, Mrs. Perrine, to secure her for money due her, but it was not recorded until a month after it was given, and the omission to file was intentional, and there was no immediate change of possession. On the day the mortgage was filed the mortgagee took possession, and after advertisement, sold the property and bought it as the highest bidder at the auction sale. Other creditors obtained judgment subsequent to the sale under the chattel mortgage, and upon executions being returned unsatisfied, a receiver was appointed. He brought this action to set aside the mortgage and recover the property or its value. Judg-

ment was rendered for plaintiff in the court of first instance, not on the ground that the mortgage was not given to secure an actual indebtedness, but that it was absolutely void because it had not been recorded as soon as made. It was held on appeal, reversing the supreme court, that the receiver, under the judgments, was entitled to recover on the ground that the mortgagee *claimed under the mortgage, having taken possession under it, there being no evidence that it was done by the consent or concurrence of the mortgagor.* The case was put substantially on the same ground as that of *Mandeville* v. *Avery,* as will be seen by an examination of the opinion of Judge Peckham, on pages 480 to 482. At page 481 he says: " If, before any lien had been acquired by the creditors, the mortgagors had delivered the property to the mortgagee in payment of her debt, she could have then held it, because it would have been, in such a case, a transfer of property by them in payment of their debt, and although it would have been, in fact, preferring such debt, yet it would have been a preference which the mortgagors then had the right to make. But in this case there was nothing of the kind done. *The mortgagee acted under and by virtue of her mortgage all the time.* The mortgagors did not deliver the property to her in payment of her debt. She took it under the assumed right given by the mortgage." He then refers to the opinion of Judge Earl, in *Tremaine* v. *Mortimer, 128 N. Y. 1,* where that learned judge says that: " The mortgagor in a mortgage which has not been filed may, as between himself and his creditors, treat the mortgage as if it did not exist, and before the creditors obtain a lien on the property, he may deal with it in any honest way. He may sell it, or assign and transfer it and give an absolute title, or he may deliver the property to the mortgagee in payment of his debt." And again, in distinguishing two other cases, he says: " It will be seen, upon a perusal of the facts, that it was the act of the mortgagor by his general assignment in each of the cases, made subsequent to the making of the mortgage, which transferred the title and caused the decisions in those cases.".

The language of Judge Earl above quoted is quite in point.

None of the cases cited by counsel go further than the two just referred to, and the radical difference between these cases and that in hand is that in the New York cases possession was taken and title claimed under a mortgage absolutely void at the moment when possession was taken. Here whatever change, actual or constructive, of possession took place, occurred at the moment when the mortgage was executed. So that it was always either absolutely void or absolutely good.

Here it is plain that Mrs. August claimed and got nothing under the mortgage. The mortgagors remained in possession and sold the goods and voluntarily paid the proceeds to their mother.

In answer to the very able and ingenious argument of the counsel for complainant upon this point, I make this general remark: It seems to me that the complainant is in this dilemma: If Mrs. August did not take possession under the mortgage as is alleged, and as I find, then it was absolutely void; she claims nothing under it; and her sons had the right, as against complainant, to sell the property and pay her her debt out of the proceeds. If, however, the sons or any other person acting as her agent, took possession of the goods, it being admitted that whatever possession was taken, was taken immediately, then the mortgage was perfectly good; and I do not see how the complainant can say in this case that it was void for one purpose and good for another. In other words, the two sons were in the actual possession of the goods, and such possession was either in their own right as owners and mortgagors, or in the right of their mother as mortgagee as her agents and representatives. In either case they had the right to sell the goods, and she had the right, if her claim was just, to receive and hold the proceeds of sales as against their creditors not having actual liens. As between mother and sons this mortgage was good, though void as to creditors; and the right of the mortgagor and owner while in possession and before levy made to sell and dispose of the chattels with the consent of the mortgagee of a mortgage void as to creditors, and to pay the proceeds to the mortgagee, is conceded, not only by the two cases relied upon by the com-

plainant and above mentioned, but by other New York cases, notably *Kitchen* v. *Lowery, 127 N. Y. 53.*

It follows that this last question of law I must decide against the complainant, and hold that if August Brothers did, in good faith, owe their mother the moneys claimed, they had a right to sell the goods and pay the proceeds to her, and thereby prefer her as a creditor.

The argument that the instrument in question was actually made use of to hinder creditors has not escaped my attention. The evidence indicates that the bulk of the goods was sold after complainant recovered judgment in New York. No proof was offered to show that the mortgage was at any time used to prevent the sheriff from making a levy. No proof was offered that he ever attempted to make one. The law governing the case being well known to complainant, it follows that the instrument could not stand in the way of the sheriff making a levy, except when set up by some one in the actual possession of the goods as the agent and representative of Mrs. August, the mortgagee, for, in order to satisfy the statute, the possession must not only be actual but continued. Now, there is no proof of any such claim made to the sheriff. On the other hand, it appears that the defendant Jacob was examined upon supplemental proceedings upon complainant's judgment in New York, on the 15th of February, 1894. He then disclosed the whereabouts of the stock of goods, and the fact that it had been transferred to his mother in payment, or attempted payment, of her claim against the firm, and that he and his brother were in actual possession and engaged in selling the goods, and were paying the proceeds over to their mother. The general nature of the deed of transfer was stated by the deponent from memory, and its present possession and custody by his mother's counsel in New York frankly and freely stated. Whether an effort was made at that time by complainant to see and ascertain its true nature does not appear. But it does appear that it was produced by some person and seen by counsel for complainant at the examination of the defendants held under the bill for discovery before a master, in May, 1894, and the true situation of affairs and the legal rights

of the parties were then fully developed and made plain. There was no concealment. At that time only about $7,000 of goods had been sold, while the total sales reached $19,000. Complainant's judgment is less than $7,000. It thus appears that complainant had ample opportunity to issue an *alias* execution in New York and levy upon goods enough to pay its debts after it had complete information as to the situation of affairs and the rights of the parties. Why such proceeding was not taken does not appear.

No point was made that the complainant obtained a lien under the laws of New York upon the goods by the mere delivery of the execution to the sheriff without actual levy.

*Fourth.* This brings me to the question of fact in the cause, was there an actual debt due from August Brothers to their mother?

The answer to this question requires us to go back to the original formation of the firm of August Brothers, in the year 1878, and to the situation of the family at that time.

Simon August, the father, who has died pending this suit and before the hearing, was for many years a merchant in the clothing trade in the city of New York, being the head of the mercantile house of August, Bernheim & Bauer, which was continued after his retirement under the name of Bernheim, Bauer & Company. The uncontradicted evidence of his wife and children is that he was at one time a man of considerable means, and of good commercial standing. They had four sons, whose names, stated in the order of their ages, are Elias, Jacob S., Abraham S. and Charles. Elias and Jacob formed the first partnership of August Brothers, in 1878. They had some little money of their own, and other moneys were given to them by their father and mother to use as capital. In addition to out-and-out gifts, their father and mother, as they allege, also loaned them money. The books of August Brothers show a credit to Henrietta August, on September 17th, 1878, of $6,000 cash. She is afterward credited regularly with interest on that sum, and charged with some small payments, apparently on account of interest. The first question is as to the origin of that $6,000.

She says that it was the proceeds of a mortgage which she had and which she sold, and the origin of the mortgage debt was money which her husband gave her from time to time for the support of the family and for her own use, and that, being of a saving disposition, she saved it up and accumulated it. She certainly had money in savings banks prior to 1878, to the amount of several thousand dollars, as shown by the bank accounts. The father's account is also credited at the same time on the books with $30,000 or more cash loaned.

On the 2d of January, 1880, the third son, Abraham S. August, was admitted as a partner into the firm of August Brothers, although he was not yet quite of age, and on that day his mother, as the defendants all swear, made him a present of $6,000, and his father made him a present of $4,000, to put in as capital, and his mother's account on the books of the firm is, on that day, charged with $6,000, and his father's account with $4,000, and both sums credited to Abraham S. August. Then on the last day of that year, 1880, the account of Simon August, on the books, is charged with $10,000, and the account of Henrietta August is credited with $10,000 transferred from the account of Simon. This, the defendants swear, was a present from the father to the mother, perfected by a transfer by debit and credit from the father's to the mother's account, and this is the real commencement of her claim. She is credited with interest on that sum from year to year up to the 31st of December, 1884, and charged with some payments made on account. She is further credited, on the 19th of September, 1884, with the sum of $4,692.03. This sum, the sons explain, was not paid into the firm at that time, but was the accumulation of a series of loans in smaller sums previously from time to time made by their mother to the firm and carried on the petty-cash book, and then on September 19th, 1884, by her direction, transferred in a lump from that book to her general account, so that on the 31st of December, 1884, she stands credited with a balance of $15,372.58. She is credited with interest from time to time on that sum, and on the 17th of June, 1886, she is credited with the sum of $6,758.14, which, like the previous sum of $4,692.03,

under date of September 19th, 1894, was composed, as her sons swear, of items of money previously deposited by her with them from time to time and entered on the petty-cash book, and then transferred by her direction in a body to her ledger account. Afterward interest is added and charges made for moneys paid, so that the balance, on the 31st of October, 1887, was $23,864.50. That balance is found on Ledger No. 3 of August Brothers. Ledger No. 4 of August Brothers and the accompanying journal are missing.   They covered the period from 1887 to the fall of 1890.   On January 1st, 1890, Elias August left the firm, and the business was continued under the same name by the two brothers, Jacob and Abraham, the defendants herein.   Their ledger, called Ledger No. 1 of the new firm, shows a credit to Henrietta (there called Henrietta S. August, meaning Henrietta, the wife of Simon, to distinguish her from another Henrietta August, the wife of another man of that name), January 6th, 1891, of $481.22; October 31st, 1891, interest and discount, $28.87; November 1st, cash, $1,500, and on the same day with $25,000, it being alleged and sworn to by the defendants that that $25,000 was the balance due her upon the last ledger, No. 4, of the previous firm of August Brothers, their evidence being that on the last day of the year 1890 there was due her $25,481.22 on the missing ledger, and of that sum $481.22 was carried forward to the new firm ledger on the 6th of January, 1891, and the even money, $25,000, stood to her credit on the old ledger until the 1st of November, when it was transferred to the new ledger, the reason for this delay being that the old firm was in liquidation, and these and similar accounts were not carried forward to the new firm ledger until the solvency of the old firm was proven by its liquidation.   They swear that it was so proven, and that the old firm's debts were all paid and the stock of goods taken by the new firm, and that the mother directed that her account should be transferred to the new firm.   She is further credited with interest and discounts, and with divers items of cash, so that the balance on the 5th of December, 1892, was $27.258.76.

The firm fell into difficulties early in 1893, and attempted to

13

liquidate. They paid a great many of their debts, aggregating a large majority of their indebtedness; moved away from their former place of business, and placed their remaining stock of goods in the subcellar of the firm of Bernheim, Bauer & Company, and sold them out as before stated, and paid the proceeds to their mother in payment of this debt.

The original books of the firm were produced in court, having been taken possession of by a receiver appointed under proceedings supplemental to judgment in the city of New York, and were inspected by the court. In addition to the entries on the books themselves, Mrs. August produced seven statements, purporting to be transcripts of the ledger, made from time to time, in the handwriting of some bookkeeper or member of the firm, which she said were sent to her from time to time for her satisfaction. They are dated, respectively, January 1st, 1885, January 22d, 1886, January 1st, 1887, November 1st, 1887, October 31st, 1888, November 1st, 1890, and November 1st, 1891. A comparison with the ledgers produced shows them to be true transcripts so far as the books are produced. They have the appearance of being genuine, and of having been made at the time they respectively bear date. No promissory note was ever given, or other evidence of indebtedness except these statements. She swears that she trusted her sons to take care of her money and pay her interest on it, and that the statements of account which she received from time to time were all the evidence that she required or desired. There is no room for doubt as to the authenticity of the books or the genuineness of the entries found therein. The statements of account produced by Henrietta supply documentary evidence of the existence of the balance in her favor on the missing Ledger No. 4.

If these facts are reliable, then the indebtedness is established.

Their reliability is attempted to be met and overthrown by the preliminary examinations, taken under the creditors' bill, of the three defendants Henrietta, Jacob and Abraham. I have read those examinations with great care, and have compared them with the evidence of the same persons given orally at the hearing of the cause, and with the entries on the books, and I come

to the conclusion that, while there are some apparent inconsistencies raised from the casual reading of the preliminary examination, I find that, upon closer examination, most of them disappear or are otherwise satisfactorily accounted for. Mrs. August never saw the books of account, knew nothing about them, except as she was furnished with statements. I think it quite manifest that when she was first examined she had not looked at the statements for a long time—in fact, had not prepared herself at all for the examination. She is of foreign birth, and speaks and understands our language pretty well, but not perfectly. She is somewhat advanced in years. The most suspicious thing in her evidence is that she at first had forgotten that her husband had given her $10,000 to loan to the firm; but I think, taken altogether, her evidence is clearly consistent with the evidence of her sons and the books, including the transcripts from the savings bank books which have been put in evidence; that she was a saving woman, and did put by money from time to time as she received it; and that her money was put to her account with her sons from time to time in comparatively small amounts. There is no dispute but that her husband was, at that time, a man of considerable means; in good mercantile standing up to a very recent date; and there is nothing improbable in the statement that he made her presents from time to time of money, and that she saved considerable of what was given her for her personal use, and what may be termed " housemoney."

The conclusion that I have reached on this part of the case is contrary to my first impressions, and is made in full consciousness of the duty of the court to scrutinize these family accounts with great care. Notwithstanding these considerations, I am forced to the conclusion that the debt to Henrietta was a real one in one sense of the word—that is to say, it was not in any sense fictitious; the money was originally had and used by the old firm.

It was urged that even if that be so, and the old firm did actually have their mother's money to the extent claimed, still it does not sufficiently appear that the debt was not, in fact, paid

by the old firm in the course of its liquidation; that there are circumstances tending to show that such was the fact. In the first place, it is urged that the absence of the last ledger, No. 4, of the old firm, and the corresponding journal, is suspicious and not well accounted for. So far as relates to the accounts given by the members of the firm under oath, of the loss of those books, I cannot say that there was anything suspicious in the manner in which that evidence was given. The remarkable circumstance is that two large books like these should have disappeared and not reveal themselves upon the careful search which appears to have been made. All the books were moved with and at the same time as the stock of goods was moved from the store formerly occupied by August Brothers to that of Bernheim, Bauer & Company, and these two books in question were first missed after that removal. The brothers swear that diligent search was immediately made for them, without success. The only probable theory that suggests itself to my mind as to their loss is that they were separated from the larger mass for the purpose of the liquidation of the old firm, and were never restored to their proper place, and were overlooked.

Another circumstance relied upon as suspicious is that the entry on the ledger of the old firm of $25,481.22 as of November 1st, 1890, to the credit of Mrs. August, appears to have been made at two sittings, the figures " 25 " at one time and the figures " 481.22 " at another time. How long apart the sittings were the expert was unable to state. I have already referred to the separation of these two component parts of the whole sum of $25,481.22 on the ledger of the later firm. The ledger upon which this difference was found by the expert was an extra ledger, called a pocket ledger, kept by the firm as a transcript of their regular ledger, and deposited each night in a neighbor's safe for safety in case of fire. The one in question covered but a few of the last entries of the year 1890, which was the last year of the existence of the old firm of August Brothers. They seem to have made up their accounts each year to November 1st, 1890, and it may well be that the figures " 25 " were written first, and then, after exact calculations of interest were made,

Nat. Shoe and Leather Bank *v.* August.

to ascertain the precise odd dollars and cents due, the figures "481.22" were added, it may be, half an hour, or an hour, or twenty-four hours later.    While I am pretty well satisfied that the expert's evidence is reliable, I am not satisfied that they indicate any fraudulent manufacture of a debt.    The circumstances do not reveal any occasion that the firm had, at that time, to indulge in any such fraudulent entries.    The other books of the firm—the check-books, bank pass-books and others, showing their daily transactions—were preserved.    The complainant had access to them while they were in the possession of August Brothers, and they were subsequently taken away by the receiver and produced at the trial by the complainant. They had every opportunity to ascertain whether they disclosed any evidence of payment of this large sum to Mrs. Henrietta August.    No such evidence is pointed out.    I find myself unable to infer a payment of this loan from the circumstances referred to.

But counsel for complainant take the further point that these family accounts, including one not before mentioned, to Minnie August, the wife of Jacob, were so arranged and carried on the books as to work a fraud on the creditors, and should not be paid until after the creditors are paid, they being, in point of fact as against creditors, mere contributions to the capital and subject to the payment of all the debts.    I am unable to find anything in the evidence to warrant that conclusion.    It does not appear that representations were ever made by the firm as to their capital in which a fraudulent use was made of these loans, or that their indebtedness to their relatives was ever denied or concealed.    The fact that persons so engaged in business are liable to owe confidential debts is notorious, and creditors inquiring into the financial standing of their debtors, or proposed debtors, always make inquiries on that subject.    These credits to their relatives were kept openly upon their regular ledgers, and I am unable to perceive upon what principle it can be held that they were capital and not debts.

I think the bill should be dismissed, and will so advise.